EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| DANNY N. BRITTINGHAM, § <br> *Plaintiff,* § <br> § <br> v. § <br> § <br> CONSUMER ADJUSTMENT COMPANY, INC., § <br> *Defendant.* § <br> § | CASE NO. 1:21-cv-00096-MU |

## AFFIDAVIT OF ROGER WEISS

BEFORE ME, the undersigned authority, on this day personally appeared Roger Weiss, known to me to be the person whose name is subscribed on this instrument and, having been first duly sworn, upon oath deposes and states as follows:

1. I am over the age of eighteen (18) years, of sound mind, and have never been convicted of a felony or misdemeanor of moral turpitude and am fully competent to make this Affidavit. I have personal knowledge of all the facts set forth in this Affidavit and all facts and statements contained herein are true and correct and based upon my own personal knowledge.

2. My name is Roger Weiss, and I am the President of Consumer Adjustment Company, Inc. ("CACi"). In that capacity, I am familiar with this case in its entirety, as well as the systems, practices, policies, and procedures CACi uses in similar circumstances and undertook in this specific instance.

3. In my capacity as President of CACi, I also am personally familiar with all the facts and circumstances surrounding CACi's asset acquisition of Midwest Recovery Systems.

4. CACi is a Missouri corporation that is in the business of collecting debts.

1

5. CACi is a collector, not a debt buyer. In that capacity, CACi is assigned to service debts owned by other entities.

6. At any given time, CACi services approximately ____ debt accounts.

7. CACi acquired the assets of Midwest Recovery Systems ("Midwest") in September of 2019.

8. Under the terms of that asset acquisition agreement, , CACi specifically did not assume any liabilities of Midwest or its shareholders, directors, officers, affiliates, creditors, parent or subsidiary companies.

9. In the asset acquisition agreement, Midwest, as the seller, covenanted that there were no actions, suits, proceedings, or investigations pending against Midwest by any federal, state, municipal, or other governmental body.

10. In the asset purchase agreement, Midwest, the seller, also covenanted that it had complied with and was operating its business in compliance with all laws, regulations, and orders applicable to its business.

11. When a debtor disputes a debt through any of the credit reporting agencies ("CRAs"), CACi receives notice of that dispute through a system known as e-OSCAR.

12. When a dispute is received, either through e-OSCAR or from a consumer, the CACi employee handling the dispute will mark the account as "disputed" in CACi's system.

13. The employee then requests validation documentation from the client.

14. CACI also engages in "verification" at the time of the dispute, which is a different process than "validation."

15. "Verification" of an account involves making sure the information in CACi's system matches the information provided by the consumer or the CRAs.

2

16. "Validation," on the other hand, involves requesting supporting documentation from the client to ensure the debt is actually legitimate.

17. In other words, "verification" ensures the information concerns the correct person, while "validation ensures the components of the debt are accurate.

18. Under its policies and procedures, when CACi does not receive validation information from the client within thirty days of the dispute, CACi requests the CRAs delete their information on the disputed account.

19. The account that is the subject of Plaintiff's Complaint was received by CACi on April 18, 2020.

20. The Account originated from a debt buyer – O'Brien Wexler & Associates ("OBW") – with whom CACi no longer does business.

21. At the time it received the Account from OBW, CACi had a contractual relationship with OBW that required OBW to provide accurate information with its account assignments.

22. CACi never owned the Account, but was assigned to service it as a debt collector.

23. CACi relied upon the terms of its contractual relationship with OBW, under which OBW was required only to provide accurate information to CACi on valid accounts.

24. At the time CACi received the Account, Midwest (prior to the asset acquisition) had previously serviced multiple other accounts under Plaintiff's name. Those accounts were listed in CACi's system, reflecting information provided by Midwest.

25. Those multiple other accounts had different account numbers, original balances, and dates incurred than the Account received by OBW in April of 2021. As such, CACi believed them to be unrelated accounts.

3

26. Prior to Plaintiff's dispute in June of 2020, CACi had no reason to believe Midwest had ever serviced the specific Account CACi had received from OBW, nor that that Account had ever been the subject of a dispute. This is because the other accounts in the system appeared to be different debts than the Account received from OBW.

27. On April 20, 2020, after it received the Account from OBW, CACi began reporting on the Account to the CRAs.

28. CACi received notice of a dispute through e-OSCAR on June 26, 2020.

29. CACi followed all its policies and procedures in investigating the dispute.

30. That procedure included a request for OBW to provide validation documentation showing the validity of the debt.

31. As of July 23, 2020, CACi had not received a response to its request for OBW to validate the debt.

32. On July 23, 2020, per its procedures, CACi requested the CRAs delete the Account from their reporting.

_____, President
Roger Weiss, President
Consumer Adjustment Company, Inc.

SWORN TO AND SUBSCRIBED before me, a Notary Public, on this 20th day of May, 2022.

Notary Public in and for the State of Missouri.

My Commission Expires:

02/21/2026

CHADD CAPE
Notary Public, Notary Seal
State of Missouri
Jefferson County
Commission # 22353105
My Commission Expires 02-21-2026

4